Filed 8/27/13  In re A.E. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.E., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> HEATHER O., <br><br> Defendant and Appellant. | F066628 <br><br> (Super. Ct. No. 12CEJ300038-1) <br><br><br> **OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kevin Briggs, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.

---

\*        Before Cornell, Acting P.J., Gomes, J. and Kane, J.

-ooOoo-

Heather O. (mother) appeals the termination of her parental rights under Welfare and Institutions Code[1] section 366.26 as to her minor child A.E. Mother contends the order terminating her parental rights should be reversed because there is insufficient evidence to support the juvenile court's jurisdiction over her child. Mother claims she can challenge the court's jurisdictional findings in this appeal because she was denied effective representation of counsel throughout the dependency process. She also contends that the juvenile court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). We affirm the order.

## FACTUAL AND PROCEDURAL HISTORY

When A.E. was born in October of 2009, mother and A.E. lived with Jonathan E., who thought he was A.E.'s father, in the home of Jonathan's mother, Nora. A few months later, Jonathan and mother moved into their own apartment. When the two then separated, Jonathan moved back in with Nora and A.E. stayed with Jonathan in Nora's home about four days a week. Jonathan was concerned about mother's lifestyle and tried to file for custody of A.E. In December of 2010, paternity testing discovered that Jonathan was not A.E.'s father.[2] Nora continued to have a relationship with A.E.

By June of 2010, mother was addicted to drugs and she gave Nora a letter granting her temporary custody of A.E. While Nora did not take physical custody of A.E. at that time, she helped mother out financially and with child care.

In July of 2011, mother was involved in a robbery that led to her arrest. While mother was in local custody, mother's sister Diana said she would care for A.E. until

---

[1] All further references are to the Welfare and Institutions Code unless otherwise stated.

[2] Jonathan E. is not a party to this appeal.

2.

mother was released. Mother made arrangements for Diana and Nora to jointly care for A.E.; Diana during the week when Nora worked and Nora on weekends.

Mother was subsequently convicted of robbery and, in November of 2011, transferred to Central California Women's Facility in Chowchilla, where she remained throughout most of the proceedings.

In January of 2012, Nora became concerned over A.E.'s welfare while in Diana's care and contacted Child Protective Services (CPS). The referral was investigated and determined to be unfounded. Thereafter, Diana would not allow Nora to see A.E. None of this was known to mother.

On February 15, 2012, A.E. came to the attention of the Fresno County Department of Social Services (department) after she was severely beaten by Diana, who had mental health issues. A.E. suffered a skull fracture, lost consciousness, and required hospitalization. Diana was arrested and charged with attempted murder and cruelty to a child with deadly felony injury. Nora was contacted by the department. She showed the social worker the letter given her by mother and explained the arrangements mother made for A.E.'s care while incarcerated. Nora explained that she had not seen A.E. since the month before she reported Diana to CPS.

The department filed a section 300 petition, alleging that mother had failed to provide A.E. adequate care, supervision and protection in that she was aware that her sister Diana had mental health issues. Mother, who was still incarcerated, spoke to the social worker and confirmed that she had previously arranged for Diana and Nora to jointly care for A.E. during her incarceration. Mother acknowledged that she knew Diana was diagnosed with depression in the past, but claimed she had no idea A.E. would be hurt in Diana's care and wanted criminal charges filed against Diana. Mother asked the social worker to place A.E. with Nora and Jonathan. On February 18, 2012, A.E. was released from the hospital and placed with Nora.

At the February 21, 2012, detention hearing, mother was appointed counsel and entered a denial of the allegations. Visitation was not ordered and services not offered mother.

In March of 2012, the department filed a first amended petition naming Jonathan as presumed father and Ryan M. as alleged father.[3] Mother submitted a letter to the court requesting reunification services and visitation. She stated she had a scheduled release date of April 10, 2013, claimed to be doing everything she could in the meantime to improve herself and be a better parent, and she wanted to be involved in all court hearings.

The jurisdiction hearing was set for May 15, 2012. A second amended petition filed that day added an additional allegation under section 300, subdivision (g), alleging A.E. had been left without support due to mother's incarceration and mother's "inappropriate plan of care" for A.E. with Diana.

The report prepared in anticipation of the jurisdiction hearing recommended that the juvenile court find the allegations of the first amended petition true. The department requested disposition be continued for 30 days to assess whether mother should be offered reunification services. Attached to the report was a letter from mother asking the social worker to pass on cards and letters to A.E. Mother claimed she was participating in every available program at the prison in order to be a better mother to A.E.

Mother was present in custody at the May 15, 2012 jurisdiction hearing. At that time, the juvenile court was advised that the section 300 subdivision (b) allegation would be amended, the subdivision (g) allegation dropped, and mother would submit on the subdivision (b) count. When questioned whether she understood the consequences of waiving her right to a trial, mother stated that by doing so she believed she would be able

---

[3] Ryan M. was later determined to be the biological father, but his status was not elevated to presumed father and he did not participate in the proceedings.

to have visits with A.E. After further explanation by the court, including that she could ultimately lose her child by not contesting the petition, mother stated that she had changed her mind and did not want to sign the form. A brief recess was declared for mother to discuss the matter with her attorney.

Back on the record, mother's counsel informed the juvenile court that mother had been confused about possible consequences of waiving her right to a contested hearing. When it was explained to her that she would not lose her parental rights by executing the waiver, she agreed to do so. Thereafter, the first amended petition was sustained and the subdivision (g) allegation dismissed.

As for disposition, the department requested a waiver of 45 days in order to obtain input from a therapist as to whether A.E. should visit mother while incarcerated. The department was ordered to assess the possibility of contact visits at the prison. In addition, mother was to have Skype, electronic, or computer contact.

Mother sent the juvenile court a letter on June 19, 2012, stating that she was attending a substance abuse program five days a week, attending 12-step meetings and parenting classes, and working toward her GED.

At the hearing on July 3, 2012, mother was present and the matter was set for trial. Mother's counsel advised the court that mother had had no contact with A.E. and continued to request visits. No assessment for visits, as previously ordered by the court, had been done as yet. The department was ordered to provide one at the next hearing.

On August 14, 2012, the department asked that the juvenile court bypass services for mother under section 361.5, subdivision (b)(12),[4] based on her guilty plea to charges pursuant to Penal Code section 211. Mother again asked for visits, but the court declined

---

[4] Section 361.5, subdivision (b)(12) provides that reunification services need not be provided to a parent who has been convicted of a violent felony.

to order them, stating it would not do so until the issue of services was resolved. The hearing was continued to August 21, 2012.

The report prepared in anticipation of the August 21, 2012, hearing contained information regarding mother's contact with A.E. She had mailed pictures and letters to the department, which were given to Nora for A.E. Nora supervised telephone contact between mother and A.E., which was going well. Nora was willing to supervise prison visits, but the necessary forms had not yet been processed. A clinician for the substance abuse program at the prison confirmed that mother was participating in a substance abuse program, parenting classes, relapse prevention group and individual therapy. Mother's certificates of achievement were attached to the department's addendum report.

Because mother was only entitled to six months of services (due to A.E.'s young age) and was not scheduled for release until April of 2013, the department continued to recommend that services be bypassed.

The contested disposition hearing was held August 21, 2012. Social worker Natalie Castro testified that it would be detrimental to offer services because, due to A.E.'s young age, mother would not be able to reunify within the statutory time frame. A.E. had had minimal contact with mother, but was very close to Nora, whom she considered her grandmother. Nora had allowed ongoing contact between mother and A.E., both telephone and written, which was going well.

Mother testified that there would be a bed waiting for her in a residential treatment program for mothers and children upon her release in April of 2013. She had completed one year of sobriety in July of 2012 and continued to be involved in prison services.

At the conclusion of the hearing, the juvenile court found it was not in A.E.'s best interests to offer mother reunification services and applied the bypass provisions of

section 361.5, subdivision (b)(12) and 361.5, subdivision (e)(1).[5]  A section 366.26 termination hearing was set for December of 2012.

In anticipation of the section 366.26 hearing, the department reported that mother had weekly telephone contact with A.E., who enjoyed their conversations and recognized mother as her mother.  Mother had sent A.E. letters, which included coloring pages, letters, numbers and the alphabet.  But, due to her incarceration, mother had been unable to nurture A.E., challenge her development, or adequately engage with her.

A.E. was considered generally adoptable due to her young age of three and the absence of any developmental, physical, or emotional problems.  A.E. called her caretakers, now identified as prospective adoptive parents, "grandma" and "grandpa," but knew mother as "mommy."  A.E. had a strong parent-child relationship with her caretakers and the department recommended she be freed for adoption by them.  On December 4, 2012, mother told a social worker that she was in agreement to the prospective parent's adoption of A.E.

The contested termination hearing was held January 22, 2013.  Social worker Tanisha Brooks testified that she was assigned to the case in September of 2012.  When mother was in local custody for the section 366.26 hearing, Brooks facilitated a visit between A.E. and mother.  When she arrived at the facility for the visit, A.E. cried because she mistakenly believed she was not going to be able to have a visit with mother.  During the visit, A.E. told mother that she missed her.  Brooks testified that, although there was mutual love between A.E. and mother, she did not believe there was enough of a significant bond to cause A.E. detriment if parental rights were terminated.

_____

[5]  Section 361.5, subdivision (e)(1) provides that the court shall order reasonable services to a parent who is incarcerated, unless the court determines those services would be detrimental to the child.

Brooks testified that mother had two other visits while in local custody, both in December of 2012. Brooks believed quarterly visits took place at the prison, facilitated by Nora. Nora told Brooks the visits lasted 15 minutes each and during that time, mother and A.E. talked and A.E. comforted mother and told her to be good. Brooks believed that A.E. had a parent-child relationship with Nora and looked to her to have her needs met.

According to mother, she had no visits with A.E. while in prison, despite her repeated requests. She did have four visits, in December of 2012 and January of 2013, while in county jail awaiting court hearings. During those visits, A.E. called mother "mommy," and told her that she missed her. A.E. asked mother when she was going to get out and if she was being good. Mother described her bond with A.E. as "good," and that A.E. still knew her and loved her. She believed it would detrimental to terminate her parental rights.

Mother's documentation of services participated in while in prison was offered into evidence.

The department argued that the parent-child exception did not apply because mother had not maintained regular visits, but the juvenile court noted that quarterly visits were ordered but not provided mother.

Mother's counsel asked that the court apply the parent-child exception to adoption. Counsel noted the difficulty in this argument, given the fact that mother repeatedly asked for visits, but was not given them.

The juvenile court found A.E. both generally and specifically adoptable. It found that mother met the first prong of the parent-child exception, by her consistent but ignored requests for visitation. It found that, as to the second prong, while A.E.'s behavior during visits suggested a parent-child relationship, it did not outweigh A.E.'s need for a stable placement. A.E. had a strong parent-child relationship with her caretakers and the court found that the benefits of maintaining mother's parental rights

8.

did not outweigh those A.E. would receive through adoption.  Mother's parental rights were then terminated.

## DISCUSSION

### I.  JURISDICTIONAL FINDINGS AND INEFFECTIVE ASSISTANCE OF COUNSEL

Mother contends the termination of her parental rights must be reversed.  As argued by mother, she received ineffective assistance of counsel "throughout" her case, citing her belief that there never was a basis for juvenile court jurisdiction in her case, which subsequently resulted in the unjust termination of her parental rights.  Mother's argument is this: she contends that, although she was incarcerated throughout the entirety of this dependency case, she made adequate arrangements for A.E.'s care with Nora and Diana.  When A.E. was seriously injured by Diana, mother then asked that A.E. be placed with Nora, which is where the department placed her and where she remained throughout the case.  According to mother, this showed that she was clearly able to make arrangements for A.E.'s care despite her incarceration, thus eliminating any need for dependency jurisdiction.  Mother contends further that counsel was ineffective for failing to object to the basis for jurisdiction, and that counsel was ineffective for assisting mother in waiving her rights to a contested hearing on the issue of jurisdiction.  We find mother has forfeited these issues.

In dependency proceedings, the dispositional order is the appealable judgment. (§ 395; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150.)  The juvenile court's jurisdictional findings are appealable from the dispositional order.  (*In re Megan B.* (1991) 235 Cal.App.3d 942, 950.)  "[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order. [Citations.]"  (*Meranda P., supra,* p. 1150.)  This "waiver rule" applies even where, as here, the issue raised concerns the effectiveness of trial counsel.  "[I]f a parent, for whatever reason, has failed to timely and appropriately raise a claim about the existence or quality of counsel received at a proceeding antedating the [section 366].26 hearing, we

9.

will apply the waiver rule to foreclose the parent from raising such an objection on appeal from the termination order." (*Id.* at p. 1160.)

Mother did not challenge the juvenile court's jurisdictional findings on appeal from the juvenile court's dispositional order. Consequently, we conclude she waived her right to raise a claim of ineffective assistance of counsel.

## II. BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

Mother contends that the juvenile court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). We disagree.

Pursuant to section 366.26 subdivision (c)(1), if the court determines "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption," unless the parent proves the existence of a statutory exception. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.) One such exception exists if "[t]he [parent has] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to show that the beneficial relationship exception applies. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1345.)

A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.) The relationship that gives rise to this exception to the statutory preference for adoption "'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.]" (*In*

*re K.P., supra,* at p. 621.) In addition, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

We are aware of the split in authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 and *In re K.P., supra,* 203 Cal.App.4th at pp. 621-622 [hybrid combination of substantial evidence and abuse of discretion standards]; *Autumn H., supra,* 27 Cal.App.4th at p. 576 [substantial evidence test]; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [abuse of discretion test].) Our conclusion in this case would be the same under any of these standards.

Here, the juvenile court found that mother had established the first prong of the section 366.26, subdivision (c)(1)(B)(i) exception, regular visitation, in that she had consistently written cards and letters to A.E., participated in weekly telephone contact with her and, while in local custody, was able to have jail visits. But the juvenile court found that mother had failed to establish the second prong, that strength of the parental bond outweighing the benefits of adoption. Mother asserts the juvenile court erred in so finding because A.E. viewed mother as her mother and Nora as a grandmother, and maintaining these ties as they existed was in A.E.'s best interests.

In support of mother's position, she states she raised A.E. for the first 21 months of her life and A.E. knows her as "mommy." Mother notes that a social worker overheard A.E. telling mother that she missed her and cried when she thought she would not have a visit with mother. Mother claims this evidence is sufficient to show that A.E. would be harmed if the relationship is severed.

We disagree. The beneficial parent-child relationship required mother to show that she shared a relationship with A.E. that "promote[d] the well-being of the child to

11.

such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

In determining whether the beneficial parent-child relationship exception applies, the juvenile court takes into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or negative' effect of interaction between parent and child, and the child's particular needs .…" (*Autumn H., supra,* 27 Cal.App.4th at p. 576.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Id.* at p. 575.)

It is important to recall that at this point in the proceedings at which the juvenile court makes this determination, the child's interests in a permanent home is paramount. It is an extraordinary case where preservation of a parent's rights at this juncture would prevail over the Legislature's preference for adoptive placement. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.) This is not one of those extraordinary cases.

There was substantial evidence that A.E. would benefit more from the permanency of adoption than she would from maintaining a legal relationship with mother. Although mother may have kept up contact with A.E. while she was incarcerated, there was nothing to indicate that A.E. had a substantial, positive emotional attachment to mother, or that she would be greatly harmed if this relationship was severed. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) In fact, even before A.E. was taken into protective custody in February of 2012, mother was not providing for A.E.'s physical care, nourishment, affection and stimulation on a day-to-day basis, as evidenced by the fact that she was addicted to drugs before A.E. turned two and was involved in a robbery that led to her arrest before A.E. turned three. In addition, there was evidence that A.E. was stable, happy, thriving, and growing and developing in her relationship with Nora. !(RT 1053)!

We find that there is substantial evidence to support the juvenile court's finding that the benefit of A.E.'s existing relationship with mother does not outweigh the well-

12.

being A.E. would gain in a permanent home with Nora, her adoptive parent. In addition, we cannot say that the juvenile court abused its discretion when it concluded that any detrimental impact from severance of the limited relationship A.E. had with mother was outweighed by the benefits to A.E. that would come from adoption.

## DISPOSITION

The order terminating mother's parental rights is affirmed.